8 **UNITED STATES DISTRICT COURT**

9 **EASTERN DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| ZINA VIDAL, | Case No.: 1:17-cv-01359 - JLT |
| Plaintiff, | ORDER REMANDING THE ACTION PURSUANT TO SENTENCE FOUR OF 42 U.S.C. § 405(g) |
| v. | |
| NANCY A. BERRYHILL, Acting Commissioner of Social Security, | ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF PLAINTIFF ZINA VIDAL AND AGAINST DEFENDANT NANCY A. BERRYHILL, ACTING COMMISSIONER OF SOCIAL SECURITY |
| Defendant. | |

Zina Vidal asserts she is entitled to a period of disability and disability insurance benefits under Title II of the Social Security Act. Plaintiff argues the administrative law judge erred in evaluating the medical record and seeks judicial review of the decision to deny her application for benefits. Because the ALJ failed to address limitations identified by several physicians, the matter is **REMANDED** for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

## **PROCEDURAL HISTORY**

On February 8, 2013, Plaintiff filed her application for benefits, alleging disability beginning August 1, 2011. (Doc. 9-6 at 3) The Social Security Administration denied Plaintiff's applications for benefits at the initial level and upon reconsideration. (*See generally* Doc. 9-4) Plaintiff requested an administrative hearing and testified before an ALJ on March 1, 2016. (Doc. 9-3 at 16, 31) The ALJ concluded Plaintiff was not disabled and issued an order denying benefits on May 31, 2016. (*Id.* at 16-25) The Appeals Council denied Plaintiff's request for review of the decision on August 14, 2017. (*Id.*

at 4-6) Thus, the ALJ's determination became the final decision of the Commissioner of Social Security ("Commissioner").

## **STANDARD OF REVIEW**

District courts have a limited scope of judicial review for disability claims after a decision by the Commissioner to deny benefits under the Social Security Act. When reviewing findings of fact, such as whether a claimant was disabled, the Court must determine whether the Commissioner's decision is supported by substantial evidence or is based on legal error. 42 U.S.C. § 405(g). The ALJ's determination that the claimant is not disabled must be upheld by the Court if the proper legal standards were applied and the findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)). The record as a whole must be considered, because "[t]he court must consider both evidence that supports and evidence that detracts from the ALJ's conclusion." *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

## **DISABILITY BENEFITS**

To qualify for benefits under the Social Security Act, Plaintiff must establish she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if:

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B). The burden of proof is on a claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990). If a claimant establishes a prima facie case of disability, the burden shifts to the Commissioner to prove the claimant is able to engage in other substantial gainful employment. *Maounois v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

**ADMINISTRATIVE DETERMINATION**

To achieve uniform decisions, the Commissioner established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 404.1520, 416.920(a)-(f). The process requires the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity during the period of alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual functional capacity ("RFC") to perform to past relevant work or (5) the ability to perform other work existing in significant numbers at the state and national level. *Id.* The ALJ must consider testimonial and objective medical evidence. 20 C.F.R. §§ 404.1527, 416.927.

**A.  Relevant Medical Background[1]**

In April 2010, Plaintiff was working at T-Bones Steakhouse in Bakersfield, California, as a server/hostess when she slipped and fell on the recently-mopped floor. (Doc. 9-8 at 3) Plaintiff fell on her knees "and suffered a laceration to the left middle finger when the plates she was carrying broke." (*Id.*) The following day, Plaintiff reported the injury but was not offered treatment. (*Id.*) "After repeatedly requesting to be referred to a doctor, she was ultimately seen … in August 2010." (*Id.* at 3-4)

Dr. Peyman Sarrafian evaluated Plaintiff on August 18, 2010. (Doc. 9-8 at 42) Plaintiff reported she had pain in both knees and her left wrist, which she described as an "8/10" in intensity. (*Id.*) Plaintiff told Dr. Sarrafian that her pain was exacerbated by activity and "alleviated by resting or massage." (*Id.*) Dr. Sarrafian determined Plaintiff's knees were "stable to varus and valgus," and found "no erythema, no swelling, no deformity, and no other abnormality." (*Id.* at 43) He found Plaintiff had "minimal tenderness on the medial aspect of the left knee and lateral aspect of the right knee and …minimal tenderness of the anterior aspect of both knees." (*Id.*) Dr. Sarrafian opined the left wrist was normal, without deformities, swelling, or erythema. (*Id.*) He ordered x-rays of Plaintiff's knees and wrists, and prescribed Ibuprofen to Plaintiff. (*Id.*)

The following week, Plaintiff told Dr. Mark Kasow that she did not have any improvement with

---

[1] Plaintiff's challenge to the ALJ's decision relates to the medical evidence and findings concerning her physical abilities. (*See* Doc. 13 at 6-11) Thus, while the Court has read and considered the entire record, the summary of the record does not address Plaintiff's mental abilities.

3

Ibuprofen. (Doc. 9-8 at 39)  She again described the pain as an "8/10" in intensity.  (*Id.*)  Dr. Kasow determined that Plaintiff had a full range of motion in her left wrist and normal grip strength. (*Id.*)  He found no deformities, tenderness, or swelling in the wrist. (*Id.*)  Dr. Kasow found Plaintiff exhibited tenderness in the left knee but found her knees were stable without deformities, effusion, or locking. (*Id.*)  He observed that Plaintiff had a "full active range of motion," though she squatted and arose 50% with pain. (*Id.*)  Dr. Kasow diagnosed Plaintiff with knee contusion and wrist sprain, for which he prescribed Naproxen and Acetaminophen. (*Id.* at 40)  He instructed Plaintiff to complete a home exercise program and indicated she may perform "[r]egular activity." (*Id.*)

Plaintiff attended physical therapy but felt claustrophobic doing the session in the basement of a building.  (Doc. 9-8 at 4, 87)  On September 1, 2010, Plaintiff reported she felt her symptoms were improving, though she continued to report her pain was 8/10.  (*Id.* at 87)  Dr. Kasow determined Plaintiff had a full range of motion in her left wrist and both knees but noted that she exhibited tenderness.  (*Id.*)  Dr. Kasow determined Plaintiff required modified activity and should do "[n]o prolonged standing/walking longer than tolerated" and should "[s]it as needed." (*Id.* at 88)  In addition, Dr. Kasow determined Plaintiff should not squat or kneel. (*Id.*)

Further treatment for her work-related injuries was not authorized until the spring of 2011, when Plaintiff's insurance "set[] her up with [a] 1st floor physical therapy establishment." (Doc. 9-8 at 37) She then again began physical therapy in April. (*See id.* at 4, 37)

On April 4, 2011, Dr. Steven Becker noted Plaintiff exhibited tenderness in her left middle finger from the distal interphalangeal joint to the wrist, and over the palm of her hand.  (Doc. 9-8 at 37) He also found Plaintiff had "right knee tenderness, both lateral and medial to the patella, and left knee tenderness just proximal to the patella." (*Id.*)  Dr. Becker prescribed Ultracet and referred Plaintiff to an orthopedic hand specialist. (*Id.*)  Later that month, Dr. Sarrafian noted Plaintiff continued to exhibit tenderness in the left wrist and both knees. (*Id.* at 38)  Plaintiff described her pain as an intensity level of "5/10," and said it was exacerbated by activity. (*Id.*)

Dr. Robert Gazmarian performed a Qualified Medical Examination on May 3, 2011.  (Doc. 9-8 at 3)  Plaintiff described the pain in her knees as a "6/10," and said the pain was "present all the time and increase[d] to a level of 8/10 by the end of the day." (*Id.*)  She told Dr. Gazmarian that she had

popping sensations in her knees and her gait was affected, which caused "pain and discomfort in her right hip." (*Id.*) Plaintiff believed that climbing stairs would aggravate the pain, and "prolonged sitting [would] cause the knees to stiffen." (*Id.*) Plaintiff told Dr. Gazmarian that she continued to have pain in her left hand and wrist, which she "rated at 3-5/10," and that "her left middle finger [felt] stiff." (*Id.*) Dr. Guzmarian determined Plaintiff had a full range of motion in her upper left extremity, including wrist extension and flexion. (*Id.* at 6) He found Plaintiff's incision on her long finger was "well healed with [a] slight decrease in sensation." (*Id.*) In addition, she exhibited tenderness "with palpable catching without locking" in her finger. (*Id.* at 7) Dr. Guzmarian found Plaintiff had a full range of motion with her knees, but exhibited "moderate tenderness" at the medial joint line. (*Id.*) He recommended Plaintiff undego imagining on her "knees to rule out surgical pathology." (*Id.* at 7) Dr. Gazmarian concluded Plaintiff could "return to work in a light-duty capacity regarding her hand of no repetitive activity greater than 30 minutes, with 5 minute breaks, and no repetitive bending, squatting, stooping of either knee." (*Id.*)

On May 11, 2011, Plaintiff told Dr. Sarrafian she did "not feel better" after physical therapy, and she did "not note[] any improvement" with her medication. (Doc. 9-8 at 33) She described her pain level as "6/10," and could not "identify any alleviating factors." (*Id.*) Dr. Sarrafian determined Plaintiff exhibited tenderness of the volar radial wrist, and "[t]enderness of the anterior aspect" of both knees. (*Id.*) He directed Plaintiff to continue with her current physical therapy, and to have an evaluation with a hand surgeon. (*Id.* at 34)

Dr. Kamran Aflatoon performed an initial orthopedic evaluation and consultation regarding Plaintiff's knee pain on May 12, 2011. (Doc. 9-8 at 78) Plaintiff told Dr. Aflatoon that he was "unable to really stand for prolonged period of time or do squatting and kneeling that she used to do." (*Id.*) He determined Plaintiff had a full range of motion in her knees, but exhibited "mild tenderness over the superior aspect of the patella." (*Id.* at 80) Dr. Aflatoon diagnosed Plaintiff with bilateral quadriceps tendinitis and bilateral knee pain. (*Id.* at 81) He noted Plaintiff was "taking a muscle relaxant which [was] not really useful for this situation," and recommended she take an anti-inflammatory medication. (*Id.*) Dr. Aflatoon also "recommended daily exercise and strengthening [for] her quadriceps. (*Id.*)

Dr. Alarick Yung performed an "initial hand surgical consultation" on May 31, 2011. (Doc. 9-8

at 30) Plaintiff told Dr. Yung that she experienced "some occasional triggering to the left middle finger," which "happened a few times per week." (*Id.*) Dr. Yung determined Plaintiff had a full range of motion in her wrists and fingers and found no triggering. (*Id.* at 31) He determined Plaintiff did "have a palpable tendon nodule with mild crepitus at the left middle finger A1 pulley," which was nontender. (*Id.*) Dr. Yung further found:

> She has intact sensibility to all 5 fingertips and good capillary refill. Plaintiff has a negative Tinel sign over the carpal tunnel. Negative Durkin sign to the left wrist. The remainder of the left wrist and forearm examination is benign. Her wrist is stable. It is nontender. There is no swelling.

(*Id.*) Dr. Yung diagnosed Plaintiff with "left middle finger sclerosing tenosynovitis," for which he requested physical therapy be authorized. (*Id.* at 31-32) Dr. Yung concluded Plaintiff should not lift more than 20 pounds and not push or pull more than 40 pounds. (*Id.* at 32) Further, Dr. Yung opined Plaintiff should not perform "heavy or repetitive gripping with the left hand," and she should not kneel, squat, or climb ladders or stairs. (*Id.*)

Plaintiff had MRIs of her knees taken on October 30, 2011. (Doc. 9-11 at 14-15) Dr. Shah opined that in the left knee, Plaintiff had "small joint effusion" and "mild degenerative change and narrowing of the cartilage overlying the lateral tibial plateau." (*Id.* at 14) In the right knee, Dr. Shah found "small joint effusion," "mild degenerative change," and "a small defect in the cartilage overlying the weight-bearing portion of the lateral femoral condyle and narrowing of the cartilage." (*Id.* at 15)

In September 2011, Plaintiff continued to report pain in her left middle finger, which she described as "4/10." (Doc. 9-8 at 28) Dr. Sarrafian observed that Plaintiff exhibited "[t]enderness of the left middle finger," but found no erythema or swelling. (*Id.*)

Plaintiff was diagnosed with breast cancer at the end of September 2011. (*See* Doc. 9-14 at 52) She requested "the most aggressive treatment possible," which included a bilateral mastectomies and chemotherapy. (*Id.*; *see also* Doc. 9-8 at 18) Because Plaintiff was to receive treatment for her cancer in Las Vegas and was concerned about her ability to find a physical therapist there, she requested that Dr. Yung administer a cortisone injection. (Doc. 9-8 at 75)

On October 18, 2011, Dr. Yung observed that Plaintiff could "make a full fist with her left hand." (Doc. 9-8 at 75) He found "a palpable tender nodule at the left middle finger A1 pulley," which

was "mildly tender," and "some crepitus in the hand with triggering." (*Id.*) Dr. Yung administered the cortisone injection to Plaintiff's left middle finger and indicated he would "request that her physical therapy be authorized for a provider in Las Vegas." (*Id.*) He opined Plaintiff should "[c]ontinue on modified duty with the left upper extremity," including "[n]o heavy or repetitive gripping" and "[n]o lifting more than 20 pounds." (*Id.*) Dr. Yung determined also that Plaintiff should do "[n]o kneeling or squatting," should not climb ladders. (*Id.*) Plaintiff later reported the cortisone shot helped for "just a few days." (*Id.* at 24)

Plaintiff continued to describe finger pain that was a "4/10" in intensity, as well as "bilateral knee pain" in April 2012. (Doc. 9-8 at 26) Dr. Sarrafian determined Plaintiff exhibited "mild tenderness anteriorly in both knees" and tenderness in her left middle finger. (*Id.*) He directed Plaintiff to follow up with Drs. Gazmarian and Yung, and recommended she receive physical therapy. (*Id.*)

In May 2012, Dr. Yung observed that Plaintiff had a "minimally positive Finklestein sign" and "some pain with palpation." (Doc. 9-8 at 28) He found Plaintiff could "make a full wrist" and had intact sensibility. (*Id.*) Dr. Yung administered a second cortisone injection, and requested additional physical therapy for the left hand and middle finger be authorized. (*Id.*) Dr. Yung opined Plaintiff required "[m]odified duty at the left upper extremity" and should not lift more than 20 pounds, or push and pull more than 40 pounds. (*Id.* at 25)

Plaintiff had a physical therapy evaluation on June 4, 2012. (Doc. 9-13 at 28) Alex Delgado, PT, determined Plaintiff's range of motion was normal in her hips, ankle, and feet. (*Id.*) He found Plaintiff's strength in both knees was 3/5 for extension and 4/5 in flexion. (*Id.* at 29) Mr. Delgado determined Plaintiff had "functional weakness of the knees and hips and limited weight bearing." (*Id.*) In addition, he found Plaintiff had "weakness in the left wrist and hand with normal motion in the associated joints." (*Id.*)

In July 2012, Dr. Sarrafian noted Plaintiff described the pain in her left finger as "acute, moderate, atypical and aching;" and a "7/10" in intensity. (Doc. 9-8 at 72) Plaintiff continued to report pain in her knees as well. (*Id.*) Dr. Sarrafian found Plaintiff had "[t]enderness of the volar aspect of the left middle finger," and indicated she should continue taking Ultracet. (*Id.*) Dr. Sarrafian opined Plaintiff had "limited use of the left hand" and should not lift more than 20 pounds, not push more than

7

40 pounds, and not climb stairs. (*Id.*)

Dr. Gazmarian performed an orthopedic Qualified Medical Examination on October 16, 2012. (Doc. 9-10 at 12) Dr. Gazmarian noted Plaintiff described the pain in her knees as a "6/10," which "increase[d] to a level of 8/10 by the end of the day." (*Id.* at 13) She reported popping sensations in her knees and prolonged sitting caused her knees to stiffen. (*Id.*) Plaintiff told Dr. Gazmarian the pain in her left hand and wrist ranged from "3-5/10." (*Id.*) She stated that "her left middle finger [felt] stiff," and reported she felt "numbness and tingling… which extend[ed] into the wrist." (*Id.*) Dr. Gazmarian observed that Plaintiff had "moderate crepitus patellofemoral joint, with 1+ pain with compression" in the bilateral knees." (*Id.*) He also found Plaintiff had full range of motion in her wrist and fingers, though she exhibited tenderness in her finger. (*Id.* at 15) Dr. Gazmarian opined future medical care should be provided for Plaintiff's left hand, including "physician reevalauation, anti-inflammatories, corticosteroid injections, therapy, splinting, and possibly surgical release." (*Id.*)

The same day as the QME, Dr. Yung saw Plaintiff for a "hand clinic followup." (Doc. 9-13 at 12) Plaintiff reported her finger felt as though the knuckle was broken. (*Id.*) Dr. Yung determined Plaintiff did not have crepitus in her fingers but found "a palpable tender nodule at the left thumb A1 pulley." (*Id.*) He found Plaintiff had "mild tenderness with palpation of the left middle finger." (*Id.*) According to Dr. Yung, Plaintiff could "make an active fist with the left hand though with weak grip strength." (*Id.*) He believed Plaintiff was not a surgical candidate but thought a second opinion "would be worthwhile." (*Id.* at 13) Dr. Yung opined Plaintiff would require modified duty with the left upper extremity and could do "[n]o lifting, pulling, or pushing more than 10 pounds." (*Id.* at 14) In addition, Dr. Yung concluded Plaintiff should do "[n]o repetitive gripping with the hand." (*Id.*)

In December 2012, Dr. Sarrafian examined Plaintiff, who reported she did not feel any improvement with her medication. (Doc. 9-10 at 7) Dr. Sarrafian opined Plaintiff continued to exhibit tenderness in her finger and there was "no change in [the] physical exam since [the] last visit." (*Id.*) He opined Plaintiff should not be required to use her left hand and should do "no lifting more than 10 [pounds] and no pushing more than 10 [pounds]." (*Id.* at 8)

In March 2013, Plaintiff had an orthopedic consultation for her bilateral knee and left wrist complaints. (Doc. 9-13 at 2) In her right and left quads and hamstrings Plaintiff had "4+/5" strength.

(*Id.* at 3) She also had "[p]ositive patellofemoral crepitus with motion" and positive McMurray's testing in both her left and right knees. (*Id.*) Her grip strength in the left hand was "5-/5" (*Id.*) Plaintiff was diagnosed with "[b]ilateral knee chondromalacia patella" and trigger finger. (*Id.*) Michael Ebling, PA-C, and Dr. Michael Price concluded Plaintiff should "[l]imit stooping, bending, [and] kneeling to rare" and "[l]imit lifting to 10 pounds." (*Id.* at 4)

Dr. Emanuel Dozier performed a consultative examination on October 25, 2013. (Doc. 9-15 at 51) Plaintiff reported that she had pain, numbness, and tingling in her hand, which she attributed both to her work injury and a side effect of her chemotherapy. (*Id.*) She stated that she frequently dropped objects. (*Id.*) Plaintiff also reported she had problems with "pain, stiffness, and swelling in both knees," which caused "difficulty climbing stairs, getting out of chairs, standing longer than 15 minutes, sitting longer than 20 [minutes], walking more than half a mile, and lifting more than 5-10 pounds." (*Id.* at 51-52) Dr. Dozier observed that Plaintiff walked with a normal gait and was "able to transfer on and off the examination table without assistance." (*Id.* at 52) He found Plaintiff exhibited "some local tenderness and pain with crepitus of the joint line of the knees." (*Id.* at 53) Dr. Dozier determined Plaintiff's grip strength was "5/5 bilaterally." (*Id.* at 54) According to Dr. Dozier, Plaintiff was limited to standing and walking for six hours and sitting for six hours. (*Id.*) He opined Plaintiff could lift and carry 25 pounds frequently and 50 pounds occasionally, and perform "[f]requent reaching, handling, fingering, and feeling with the left hand." (*Id*. at 55) In addition, Dr. Dozier concluded Plaintiff could frequently bend, stoop, crouch, push, and pull. (*Id.*)

Dr. G. Bugg reviewed available records at the initial level of Plaintiff's application for benefits on November 13, 2013 and noted Plaintiff had mild degenerative joint disease in the knees. (Doc. 9-4 at 10) Dr. Bugg opined Plaintiff was able to lift 25 pounds frequently and 50 pounds occasionally, sit about six hours in an eight-hour day, stand and/or walk about six hours in an eight-hour day, and push/pull on an unlimited basis. (*Id.* at 12) Dr. Bugg believed Plaintiff could frequently stoop; kneel; crouch; crawl; and climb raps, stairs, ladders, ropes, and scaffolds. (*Id.* at 12-13) In addition, Dr. Bugg determined Plaintiff was limited in the left hand with handling (gross manipulation); fingering (fine manipulation); and reaching toward the front, lateral, and overhead. (*Id.*)

In April 2014, Plaintiff had x-rays taken of her knees and left hand, which Dr. Price determined

9

showed "mild degenerative joint disease" in the knees and "minimal degenerative changes" in her left hand. (Doc. 9-17 at 44) She was evaluated at Scheinberg Orthopedic Group clinic "for ongoing pain in bilateral knees and triggering of the left long finger." (*Id.* at 43) Dr. Price determined Plaintiff exhibited tenderness to palpation on her knees and "[p]ainful patellofemoral crepitus" without instability. (*Id.* at 44) He also found Plaintiff had "tenderness over the volar aspect of the left long finger flexor tendon with mild swelling." (*Id.*) Dr. Price noted Plaintiff was "currently taking chemotherapy" and requested approval for a prescription of Norco. (*Id.* at 45) Dr. Price opined Plaintiff "should "[l]imit stooping, bending, kneeling, and squatting to rare," and "[l]imit lifting and carrying to 10 pounds." (*Id.*) In addition, he indicated Plaintiff was limited to "[r]are use of [her] left hand." (*Id.*)

On June 17, 2014, Dr. J. Mitchell also concluded Plaintiff could perform medium work with postural and manipulative limitations. (Doc. 9-4 at 26) Dr. Mitchell opined Plaintiff could frequently climb tramps and stairs, stoop, kneel, crouch, and crawl; and occasionally climb ladders, ropes, and scaffolds. (*Id.* at 30) In addition, Dr. Mitchell indicated Plaintiff was limited to frequent handling and fingering with her left hand "due to [left] middle finger pain." (*Id.* at 31)

Dr. Price evaluated Plaintiff at the Scheinberg Orthopedic Group clinic on June 18, 2014. (Doc. 9-17 at 40) Plaintiff reported finger pain was "4 to 5/10 … when it triggers and clicks," and the knee pain was "3 to 5/10." (*Id.*) Dr. Price found Plaintiff exhibited painful patellofemoral crepitus and tenderness in both knees. (*Id.* at 40-41) Plaintiff requested stronger medication, and Dr. Price requested authorization for Percocet. (*Id.*) Dr. Price again opined Plaintiff should "[l]imit lifting and carrying to 10 pounds;" rarely stoop, bend, kneel, and squat; and rarely use her left hand. (*Id.* at 41)

Dr. Gazmarian performed a Qualified Medical Re-examination on June 25, 2014. (Doc. 9-16 at 39) He opined Plaintiff had "[f]ull range of motion at the wrist MCPs, PIPs and DIPs with tenderness at the A1 pulley digit 3 without locking or catching." (*Id.* at 43) He noted imagining of left knee showed "mild narrowing of joint spaces" and "mild narrowing" of the patellofemoral joints "with normal narrowing without displacement." (*Id.*) Dr. Gazmarian opined Plaintiff was "maximally medically improved for her knees" but not for her left finger due to pending surgery. (*Id.*)

In July 2014, Dr. Price observed that triggering was occurring in Plaintiff's left long finger, and she had "tenderness… with mild swelling." (Doc. 9-17 at 38) He opined Plaintiff continued to have

the same postural, lifting, and carrying restrictions. (*Id.*)

In December 2014, Plaintiff described the pain in her knees as 7-8/10 and the pain in her left wrist and hand as 8/10. (Doc. 9-17 at 30) She complained she was "dropping everything" and had "burning pain with weakness and numbness" in her left hand. (*Id.* at 31) Plaintiff reported that Hydrocodone caused an "average four [to] five point decrease in pain on [the] scale of 10," and gave her "improved range of motion and better tolerance to activity/exercise." (*Id.* at 31) Dr. Richard Scheinberg determined Plaintiff had a "[p]ositive patellofemoral compression test" and tenderness in her right knee, and painful range of motion in both knees. (*Id.*) He noted Plaintiff had triggering in her finger, and the examination findings for her finger were "unchanged." (*Id.*) Dr. Scheinberg opined Plaintiff should do "no prolonged or repetitive stooping, bending, kneeling and squatting," and "[n]o lifting or carrying greater than 10 pounds." (*Id.* at 35)

**B.    The ALJ's Findings**

Pursuant to the five-step process, the ALJ first determined Plaintiff "did not engage in substantial gainful activity during the period from her alleged onset date of August 1, 2011 though her date last insured of December 31, 2014." (Doc. 9-3 at 18) The ALJ found Plaintiff's severe impairments included "breast cancer status post mastectomy and chemotherapy, arthritis of the knees, and left middle trigger finger." (*Id.*) At the third step, the ALJ determined Plaintiff did not have an impairment, or combination of impairments, that met or medically equaled a Listing. (*Id.* at 19)  Next, the ALJ determined:

> [T]hrough the date last insured, the claimant the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b)[2] except stand and/or walk about 6 hours in an 8-hour workday; sit more than 6 hours on a sustained basis in an 8-hour workday; frequently climb ramps and stairs, stoop, kneel, crouch, and crawl; occasionally climb ladders, ropes and scaffolds; and frequent handling, and fingering using left hand due to middle finger pain.

(*Id.* at 19-20)  With these limitations, at step four, the ALJ found Plaintiff was "capable of performing past relevant work as a hostess/server, realtor, loan officer, and flower shop owner." (*Id.* at 24)  Thus, the ALJ concluded Plaintiff was not disabled through her date last insured. (*Id.* at 25)

---

[2] Pursuant to 20 C.F.R. 404.1567(b), "[l]ight work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."

11

# **DISCUSSION AND ANALYSIS**

Plaintiff contends the ALJ erred in reviewing the medical record and "failed to consider large portions of the medical evidence that document [a] greater degree of functional loss." (Doc. 13 at 6, emphasis omitted) In particular, Plaintiff contends the ALJ ignored functional limitations identified by Drs. Yung, Sarrafian, Scheinberg, and Price; as well as limitations identified by Matthew Ebling, a physician's assistant. (*Id.* at 8-10)

## A.    ALJ's Evaluation of the Medical Evidence

In this circuit, the courts distinguish the opinions of three categories of physicians: (1) treating physicians; (2) examining physicians, who examine but do not treat the claimant; and (3) non-examining physicians, who neither examine nor treat the claimant. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996). Generally, the opinion of a treating physician is afforded the greatest weight but it is not binding on the ultimate issue of a disability. *Id.*; *see also* 20 C.F.R. § 404.1527(d)(2); *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989). Further, an examining physician's opinion is given more weight than the opinion of non-examining physician. *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). Thus, the courts apply a hierarchy to the opinions offered by physicians.

A treating physician's opinion is not binding upon the ALJ, and may be discounted whether or not another physician contradicts the opinion. *Magallanes*, 881 F.2d at 751. An ALJ may reject an *uncontradicted* opinion of a treating or examining medical professional only by identifying "clear and convincing" reasons. *Lester*, 81 F.3d at 831. In contrast, a *contradicted* opinion of a treating or examining professional may be rejected for "specific and legitimate reasons that are supported by substantial evidence in the record." *Id.*, 81 F.3d at 830.

When there is conflicting medical evidence, "it is the ALJ's role to determine credibility and to resolve the conflict." *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984). The ALJ's resolution of the conflict must be upheld when there is "more than one rational interpretation of the evidence." *Id.; see also Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) ("The trier of fact and not the reviewing court must resolve conflicts in the evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ").

Plaintiff contends the ALJ erred in analyzing the medical record because the ALJ did not address evidence that conflicted with the limitations she identified in the residual functional capacity—including Plaintiff's ability to lift, carry, grip, and use her left hand. (Doc. 13 at 6-10) Plaintiff observes that "after subsequent treatment visits, Dr. Yung reduced [Plaintiff's] lifting capacity to 10 pounds and maintained the preclusion against "repetitive" gripping with the left hand." (*Id.* at 7, citing AR 556 [Doc. 9-13 at 14]) Plaintiff notes that Dr. Sarrafian, a colleague of Dr. Yung, also "reduced the lifting capacity to 10 pounds." (*Id.*, citing AR 340 [Doc. 9-10 at 9]) Further, Plaintiff contends both Drs. Yung and Sarrafian determined she was "precluded…from repetitive gripping with the upper left extremity." (*Id.*) She asserts the ALJ also failed to address the opinions of Drs. Scheinberg and Price who "attested that [Plaintiff] should be limited to lifting no more than 10 pounds." (Doc. 13 at 10, citing, e.g., AR 793, 799, 802, 805, 809 [Doc. 9-17 at 29, 35, 38, 41 45]) Finally, Plaintiff contends the ALJ failed to address the opinion of Matthew Ebling, a physician's assistant, who "also limited Vidal's lifting to no more than 10 pounds." (*Id.*, citing AR 546 [Doc. 9-13 at 4])

In response, Defendant contends the ALJ did not err in evaluating the medical evidence. (Doc. 14 at 5-8) Defendant asserts,

> Plaintiff's contention that he failed to take into proper account Alarick K. Yung, M.D.'s opinion that Plaintiff's lifting capacity was limited to ten pounds is belied by a review of Dr. Yung's findings and the ALJ's analysis. The ALJ noted that the physician was a hand surgeon, determined that she was not a surgical candidate for her left middle finger, and requested authorization for a second opinion (AR 21). At the time of the examination in May 2011, the physician limited Plaintiff to "[n]o pulling or pushing more than 40 pounds," "[n]o climbing of stairs or ladders," "[n]o kneeling or squatting," and "[n]o heavy or repetitive gripping with the left hand" (AR 371). Similarly, in July 2012, Dr. Sarrafian indicated no lifting above twenty pounds and no pushing more than forty pounds (AR 350). Both these physician's findings were consistent with the ALJ's RFC assessment (AR 18-19).

(Doc. 14 at 5) Defendant acknowledges the limitations identified by Drs. Yung and Sarrafian later changed, but contends, "the ALJ noted correctly, in the same December 2012 examination report Dr. Sarrafian observed that Plaintiff was working within her duty restrictions." (*Id.* at 5-6) Defendant argues, "The ALJ may not have directly addressed the change in opinions of doctors Yung or Sarrafian; however, the context of the ALJ's chronological analysis makes it clear that he did not accept these changed opinions." (*Id.* at 6) According to Defendant, "Even if the ALJ erred in not stating specifically that he was rejecting [the]… changed opinion, the error was harmless as it did not prejudice

Plaintiff, and the result of the case would be the identical were it remanded back to the ALJ to parse out the distinctions." (*Id.* at 8)

1. Selective reading of the record

The ALJ did not acknowledge the change in lifting and carrying restrictions imposed by Plaintiff's physicians. Though the ALJ purported to summarize the medical record and the findings of the various physicians, probative evidence was omitted from the summary, including from treatment notes addressed by the ALJ. For example, the ALJ noted that on October 16, 2012, Dr. Yung "determined that the claimant was not a surgical candidate for her left middle finger." (Doc. 9-3 at 22, citing Exh. 9F, p. 12 [Doc. 9-13 at 13]) However, the ALJ failed to acknowledge additional findings from Dr. Yung made the same day—on the next page of the treatment notes—that Plaintiff should do "[n]o lifting, pulling, or pushing more than 10 pounds" and "[n]o repetitive gripping with the left hand." (*See* Doc. 9-13 at 14)

Likewise, the ALJ indicated that "[i]n a progress note dated December 3, 2012, the claimant had been working within the duty restrictions." (Doc. 9-3 at 22, citing Exh. 8F, p. 6 [Doc. 9-10 at 7]) However, this note is contradicted by other evidence in the record, which indicates Plaintiff worked on limited duty for only two weeks after the accident after work, and then did not return. (*See* Doc. 9-8 at 5, 84) Further, the ALJ failed to address the remainder of that progress note, in which Dr. Sarrafian offered objective findings and opined Plaintiff should not be required to use her left hand and should do "no lifting more than 10 [pounds] and no pushing more than 10 [pounds]." (Doc. 9-10 at 8)

The ALJ also failed to discuss the conclusions of Dr. Price; Dr. Scheinberg; and Michael Ebling, PA-C, related to Plaintiff's postural limitations and lifting/carrying restrictions. In March 2013, Plaintiff had an orthopedic examination, after which Michael Ebling, PA-C, and Dr. Michael Price concluded Plaintiff should "[l]imit stooping, bending, [and] kneeling to rare" and "[l]imit lifting to 10 pounds." (Doc. 9-13 at 2) Throughout 2014, Dr. Price opined Plaintiff should "[l]imit lifting and carrying to 10 pounds;" rarely stoop, bend, kneel, and squat; and rarely use her left hand. (*See* Doc. 9-17 at 38, 41, 45) Similarly, Dr. Sheinberg opined in 2014 that Plaintiff should do "no prolonged or repetitive stooping, bending, kneeling and squatting," and "[n]o lifting or carrying greater than 10 pounds." (*Id.* at 35) The ALJ did not acknowledge these limitations, which were assessed during the

14

relevant time period prior to Plaintiff's date last insured.

2. Failure to address conflicts in the record

The ALJ stated that the restrictions she identified in the residual functional capacity—including the ability to lift and carry 20 pounds occasionally and 10 pounds frequently, and frequently use the left hand—were "not more restrictive than any other medical opinion." (Doc. 9-3 at 24) However, as discussed above, the record clearly included opinions with restrictions greater than those identified in ALJ's residual functional capacity.

Defendant suggests the ALJ simply rejected the opinions of Drs. Yung and Sarrafian after finding they conflicted with the addressed medical evidence and instead adopted "evaluations by other physicians [that] reach conclusions consistent with the ALJ's RFC assessment." (*See* Doc. 14 at 6-7) However, when an ALJ believes the treating physician's opinion is contradicted the objective medical evidence, the ALJ has a burden to "set[] out a detailed and thorough summary of the facts *and conflicting clinical evidence*, stating his interpretation thereof, and making findings." *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986) (emphasis added); *see also Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) ("The ALJ must do more than offer his conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct."). For example, an ALJ may also discount the opinion of a treating physician by identifying an examining physician's findings to the contrary and identifying the evidence that supports that finding. *See, e.g., Creech v. Colvin*, 612 F. App'x 480, 481 (9th Cir. 2015).

Because the ALJ failed to address the conflicts in the record between the opinions addressed above and those summarized by the ALJ, she failed to carry the burden to properly evaluate the medical record. *Magallanes*, 881 F.2d at 751; *see also Lester*, 81 F.3d at 831 (holding an ALJ may only reject the opinions of treating physicians by identifying "specific and legitimate reasons that are supported by substantial evidence in the record")

**B. Remand is Appropriate**

The decision whether to remand a matter pursuant to sentence four of 42 U.S.C. § 405(g) or to order immediate payment of benefits is within the discretion of the district court. *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000). Except in rare instances, when a court reverses an administrative

15

agency determination, the proper course is to remand to the agency for additional investigation or explanation. *Moisa v. Barnhart*, 367 F.3d 882, 886 (9th Cir. 2004) (citing *INS v. Ventura*, 537 U.S. 12, 16 (2002)). Generally, an award of benefits is directed when:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996). In addition, an award of benefits is directed where no useful purpose would be served by further administrative proceedings, or where the record is fully developed. *Varney v. Sec'y of Health & Human Serv.*, 859 F.2d 1396, 1399 (9th Cir. 1988).

The ALJ failed to address probative evidence in the medical record and failed to resolve conflicts between the opinions offered by Plaintiff's physicians and the examining physician. These errors are not harmless, because the numerous opinions of the treatment providers are not "inconsequential to the ultimate nondisability determination." *See Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012). Accordingly, the matter should be remanded for the ALJ to re-evaluate the medical evidence and determine Plaintiff's residual functional capacity during the relevant time period. *See Moisa*, 367 F.3d at 886.

## CONCLUSION AND ORDER

Based upon the foregoing, the Court finds the ALJ erred in evaluating the medical evidence and the administrative decision should not be upheld by the Court. *See Sanchez*, 812 F.2d at 510. Thus, the Court **ORDERS**:

1. The matter is **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this decision; and
2. The Clerk of Court is **DIRECTED** to enter judgment in favor of Plaintiff Zina Vidal and against Defendant, Nancy A. Berryhill, Acting Commissioner of Social Security.

IT IS SO ORDERED.

Dated: **February 26, 2019**         **/s/ Jennifer L. Thurston**
UNITED STATES MAGISTRATE JUDGE